(No. 10889.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRISON KING, Plaintiff in Error.

*Opinion filed December 21, 1916.*

1. CRIMINAL LAW—*proof of misconduct not connected with the crime charged is not admissible.* Proof of misconduct on the part of the accused not in any way connected with the offense charged is not admissible, as such evidence tends to divert the minds of the jurors from the point in issue and arouse their prejudice.

2. SAME—*evidence admissible on general grounds is not objectionable because it discloses other offenses.* If evidence is admissible on general grounds it is not objectionable because it discloses other offenses, the test of admissibility being the connection of the fact proved with the offense charged, and evidence which has a natural tendency to establish the fact at issue should be admitted.

3. SAME—*proof of collateral offense may be admitted to show accused was in vicinity when crime charged was committed.* Evidence of an extraneous crime may be admitted where it tends to identify the accused as the perpetrator of the crime charged, and when an alibi is relied on it is proper to prove a collateral offense in order to show that at the time the crime charged was committed the accused was in the vicinity.

4. SAME—*when question of error in admitting proof of independent crimes is properly raised.* The question of error in the admission of proof of independent substantive crimes is properly raised in the Supreme Court under the general assignment of error that improper evidence was admitted on behalf of the People.

5. SAME—*what evidence of motive is admissible in homicide.* In cases of homicide, motive is a question of fact to be determined by the jury, and every material fact or circumstance that will throw light on the killing and every motive that might have influenced the mind of the accused may be admitted in evidence if relevant, and where the concealment of prior crimes is the motive in committing a homicide, evidence may be admitted which tends to prove that the accused was guilty of the prior crimes and knew that he was suspected by the deceased to be guilty.

6. SAME—*proof of another offense as evidence of motive should not include details.* In admitting evidence of other crimes committed by the accused in order to establish concealment thereof as the motive for committing the crime charged the details of the other crimes should not be admitted.

7. SAME—*when the evidence of other crimes cannot be brought out on cross-examination.* Cross-examination should be confined to matters brought out on direct examination, and if on direct examination the accused does not testify with reference to other crimes committed by him and is asked no question with reference thereto, it is error to permit evidence of other crimes to be drawn out on cross-examination.

8. SAME—*what is improper argument in brief before Supreme Court.* Argument of the State's attorney in his brief before the Supreme Court in a homicide case calling attention to other offenses committed by the accused and asserting that he is a bad man generally and very dangerous to society is not proper.

9. SAME—*when error in admitting evidence cannot be said to be harmless.* In a murder trial, error in admitting evidence of other crimes committed by the accused which has a tendency to predispose the minds of the jurors to believe him guilty of the crime charged cannot be said to be harmless because the competent evidence justified the verdict and the defense was weak.

10. SAME—*when testimony as to threats of third person against the deceased is inadmissible.* Testimony by the accused, in a murder trial, that he had heard a third person make threats against the deceased some time before the shooting is mere hearsay and is not admissible.

11. SAME—*judge must use care in commenting on evidence in presence of the jury.* In a criminal case, if the judge comments on the nature of the evidence in the presence of the jury at the time it is admitted it should be in such a manner as to cause the jury to clearly understand that it is admitted for what it is worth and that the jury are the sole judges of its weight and bearing on the issues before them.

12. SAME—*State's attorney's argument need not be taken down in shorthand to entitle the defendant to object to it in the Supreme Court.* It is not necessary for the defendant to have the closing argument of the State's attorney taken down in shorthand in order to entitle him to object in the Supreme Court to anything that was said therein.

13. SAME—*when affidavit as to what was said in State's attorney's closing argument must be accepted by Supreme Court.* The rule that it is not ethical for counsel to testify in a case he is trying goes only to the weight of his testimony and not to its admissibility, and if the affidavit of the counsel for the defendant as to what was said in the State's attorney's closing argument is not impeached or contradicted on the record it must be accepted by the Supreme Court.

14. SAME—*argument of State's attorney asserting his belief in the guilt of the accused is improper.* An attorney is rarely justified in stating his personal belief that the cause he is representing is just, for by so doing he makes himself a witness without the opportunity of being cross-examined, and while a remark by the State's attorney in his closing argument that he believes the accused is guilty is not necessarily ground for reversal, it is apt to inflame the minds of the jury to the prejudice of the defendant and is improper.

15. SAME—*when an affidavit as to the use of intoxicating liquor by the jurors does not show ground for new trial.* An affidavit showing that intoxicating liquors were drunk by the jurors during their consideration of the case does not show ground for new trial, where it does not state that such liquors were drunk to excess or that their use influenced the verdict, and where counter-affidavits are filed stating that only a small quantity of liquor was drunk, that no juror was intoxicated and that their verdict was not affected by their use of the liquor.

16. COURT REPORTERS—*rule as to taking down arguments of counsel.* The statute empowering circuit judges in counties outside of Cook county to appoint court reporters authorizes the reporter to take down arguments of counsel as well as the evidence, and the court, on request of counsel, should direct the reporter to take down an argument to the jury.

FARMER, J., and CRAIG, C. J., dissenting.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. T. N. GREEN, Judge, presiding.

BERNARD KELLY, for plaintiff in error.

P. J. LUCEY, Attorney General, C. E. McNEMAR, State's Attorney, and A. R. ROY, (GEORGE A. SHURTLEFF, and CLARENCE D. MURPHY, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Harrison King, was found guilty in the circuit court of Peoria county of the murder of Norman Gray, the jury fixing the penalty at death. The trial court entered judgment on the verdict and fixed the date of

the execution for June 17, 1916. This writ of error has been sued out to review the record.

January 24, 1916, at about eleven o'clock P. M., Norman Gray, a police officer of the·city of Peoria, was shot and almost instantly killed in the saloon of Dave Amburn, in said city, just after the officer had placed under arrest the plaintiff in error and John Welch. Some six people besides Welch and Gray were in the saloon at the time of the homicide. The evidence shows that before the shooting, on the evening of January 24, there had been several hold-ups by two or three men acting together; that Gray and his partner had been told from police headquarters about these hold-ups and were looking for the men; that the description they obtained over the telephone as to the perpetrators tallied somewhat with that of King and Welch; that officer Gray knew King, and apparently Welch, by sight; that not long after they were notified of these hold-ups, Gray and his brother officer, Arthur Filkins, separated, going in different directions in the line of their duty. The evidence further shows that shortly after they separated Gray entered Amburn's saloon and found King and Welch drinking beer; that he told them they were under arrest and took hold of them; that King immediately jerked away and ran out of the side door; that Gray kept his hold upon Welch, and a moment later, as he stood facing the side door through which King had run, (as all of the witnesses who were in the saloon agree,) the side door was opened and someone standing in the doorway, or, as some of the witnesses testified, stepping inside, shot the officer in the eye, causing death in a very short time. Three witnesses who were playing pool in the saloon,—George Sandov, Jim Angelo and Mike Leo,—all testified through an interpreter that the man who did the shooting came in through the side door and that he was the plaintiff in error, Harrison King. These witnesses all testified that King wore a black hat, and also testified generally with reference to the clothes he wore

that night. As soon as officer Gray placed King and Welch under arrest he asked the saloon-keeper, Amburn, to telephone to the station for the wagon to come out and take the two prisoners. Amburn did as requested, and while he was in another room, telephoning, the shooting took place. William Filaski, who was employed as a porter in the saloon at the time, was present during the shooting but died before the trial, and it does not appear whether he testified at the coroner's inquest. Joe Debel and Thomas Todhunter were also in the saloon at the time of the shooting. They both agreed with the other witnesses as to the arrest of King and Welch and as to King breaking away and running out the side door, but they both testified that they did not know who did the shooting; that someone came to the side door of the saloon through which King had just escaped and shot from the door, killing the policeman. It does not clearly appear from the evidence whether Angelo, Leo and Sandov were so situated that they could see the side door, and persons near it, better than could Debel and Todhunter. King denied doing the shooting. His companion, Welch, testified on the trial that Filaski did the shooting through or from near the side door, just after King escaped. Welch admitted that after his arrest he stated to the police authorities that he did not know who did the shooting, and that he had not told anybody before the trial that Filaski did it. He stated, also, on the witness stand, that he and King had bought the revolver used in shooting the officer from the saloon-keeper, Amburn, earlier in the evening; that he (Welch) had a conversation with Filaski just before the shooting, wherein the two agreed to go out in a short time and hold up someone to get some money; that he got the gun from King at that time and gave it to Filaski. The testimony of several of the witnesses, including Amburn, is that Filaski, immediately after the shooting, was holding Gray's head in his lap while the officer was lying on the floor of the saloon.

Shortly after the shooting a hat answering the description of the one that some of the witnesses testified King wore in the saloon immediately before the shooting was found about a block from the saloon in an alley, and the revolver not far from the hat. King and Welch both testified that King wore a cap the night in question and had it on in the saloon. King had been rooming for some days before the shooting at the house of Mr. and Mrs. Churlones, several blocks from Amburn's saloon, under the assumed name of John Smith. Mrs. Churlones testified that he returned there shortly after midnight on the night of the shooting, seemed excited and had nothing on his head,— neither a hat nor a cap. He was arrested at this house about five o'clock the morning of the 25th by the police authorities, and the testimony is that he did not have either a hat or a cap that he could wear to the station although he kept the officers waiting while he looked for one. King testified that they did not give him time to look for his cap. Welch ran out of the saloon immediately after the officer was shot and was not found by the police authorities until his arrest in Kansas City several days after, when he was brought back and placed in jail in Peoria along with King. Henry Holley, who was then a prisoner in the jail charged with burglary, testified that he overheard a conversation between King and Welch in the jail, and that King said that after the shooting he went up to Adams street, in Peoria; that he dropped the gun; that he looked for it and lost his hat, and when he saw Welch coming did not know who it was and got scared. This testimony of Holley's was not denied on the stand by either King or Welch. King and Welch, on cross-examination, both admitted, over objection of plaintiff in error's counsel, that on the evening of January 24 they had held up several people with the revolver they bought from Amburn, and had hired a livery rig to take them about to different parts of the city and tied the horse not far from Amburn's saloon shortly before they

went there. Several of the witnesses who saw them earlier in the evening testified that King wore a hat, their description fitting the hat that some of the other witnesses testified King was wearing in the saloon just before the shooting and that was found a short distance from the saloon shortly after the shooting.

Some testimony was offered during the trial for the purpose of impeaching the testimony of Sandov, Angelo and Leo, to the effect that they were under the influence of liquor at the time Gray was shot. These three witnesses admitted that they drank one or two glasses of beer earlier in the evening, but others testified that they were not so under the influence of liquor that their testimony could not be relied upon for that reason. Counsel for plaintiff in error also insists that the interpreter did not fairly interpret the testimony of these three witnesses; that he (counsel) objected and the court overruled his objections. He concedes that there is nothing in the record to show this objection, but states that he asked to have the bill of exceptions show this fact and that the court refused. From the record before us we think the conclusion is justified that they testified before the coroner's jury, shortly after the shooting of the officer, substantially as they did at the time of the trial and that their testimony was fairly interpreted.

The most serious question in the case is the ruling of the court permitting counsel for the State to cross-examine Welch and King, over the objection of counsel for plaintiff in error, as to their having held up and robbed several people on the night in question, before Gray was shot. Counsel for the State insist that this question was not properly preserved for review by this court.

On the cross-examination of Welch, who was put on the stand before plaintiff in error, he was required, over the objection of plaintiff in error's counsel, to answer a series of questions, his answers being to the effect that he and King on the night in question, before Gray was shot, had

held up three or four people, and had attempted to hold up
three or four more, on the streets of Peoria, and that they
had with them the revolver which it is conceded was used
in shooting Gray, in some instances firing shots at people
they attempted to hold up but who ran away. Afterwards,
when the plaintiff in error was on the stand, he was cross-
examined, over objection, as to practically all of these hold-
ups and attempts. The general rule under our system of
jurisprudence is, that evidence of a distinct substantive
offense cannot be admitted in support of another offense.
This is but the reiteration of a still more general rule, that
in all cases, civil or criminal, the evidence must be confined
to the point in issue. (*Farris* v. *People*, 129 Ill. 521.) This
rule excludes all evidence of collateral facts or those which
are incapable of affording any reasonable presumption or
inference as to the principal fact or matter in dispute, the
reason being that such evidence tends to draw away the
minds of the jurors from the point in issue and arouse their
prejudice. Moreover, the adverse party would not be given
notice by the charges in the indictment as to what the evi-
dence was to be as to such collateral crimes. (1 Greenleaf
on Evidence,—Lewis' ed.—sec. 52; *Janzen* v. *People*, 159
Ill. 440.) This rule is, however, subject to certain well
known exceptions. If evidence is admissible on other gen-
eral grounds it is no objection that it discloses other offenses.
The test of admissibility is the connection of the fact proved
with the offense charged, as evidence which has a natural
tendency to establish the fact at issue should be admitted.
One of the exceptions to this settled rule as to the admis-
sion of evidence of collateral crimes is when evidence of an
extraneous crime tends to identify the accused as the per-
petrator of the crime charged. When an alibi is disputed it
is admissible to prove a collateral offense to show that at
the time of the crime charged the accused was in the vicin-
ity. (*People* v. *Jennings*, 252 Ill. 534, and cases cited.)
But proof of the misconduct of a party on trial for a crimi-

276 – 10

nal charge not connected with the charge upon which he is being tried is not admissible, as such evidence is likely to prejudice the jury against the defendant and cause them to lose sight of the issues which they have been sworn to try. *Addison* v. *People,* 193 Ill. 405.

Counsel for the State insist that the question as to the admission of proof of independent substantive crimes was not properly raised in this court by the assignment of errors or in the briefs. One of the assignments of error was that improper evidence was admitted on behalf of the State. Under this assignment the improper admission of this testimony can be raised here.

In the brief of plaintiff in error it is insisted that this evidence of independent substantive crimes ought not to have been admitted because it was improper cross-examination, no testimony referring to these independent substantive crimes having been brought out on the direct examination of either Welch or King. On the cross-examination of Welch, counsel for plaintiff in error objected several times to questions as to these independent crimes on the ground that such examination was immaterial, not proper cross-examination, and also on the ground that it was not proper impeaching testimony. It is clear from the record that the trial court, in ruling to admit this testimony, did not do so on the ground that the proper objection had not been made, but rather because he thought it was admissible no matter what the objection, the court saying at the time: "You have attempted to account for the whereabouts of this man on that night and his connection with King; I take it that they have a right to inquire where he [Welch] was that night and all about it." Counsel for plaintiff in error stated correctly at that time that he had not asked Welch, on direct examination, anything about where he was that night, except with reference to Amburn's saloon. Similar objections were made to the admission, on cross-examination, of plaintiff in error's testimony as to his being engaged in the hold-

ups in question. It is not controverted that plaintiff in error was at the scene of the crime in Amburn's saloon immediately before the shooting. There was no question of an alibi, in the proper use of that term, in the case. The only question was whether plaintiff in error did the shooting, the testimony as to the identification being based partly on whether he wore a black hat at the time.

Counsel for the State now argue that these independent separate crimes were admissible for the purpose of showing a motive for King killing officer Gray; that Gray had already learned that King and Welch were wanted for the highway robberies committed earlier in the evening, and that after King escaped Gray still held Welch, and that Welch had some of the proceeds of their robberies on his person; that all these facts would tend to show motive for killing the officer. It may be stated in passing that the record does not show that this suggestion or argument was made in the trial below, at the time this evidence was admitted, as the reason for its admission. It was not proved on the trial that Gray knew that King and Welch were the men who committed the highway robberies, although there is evidence on the part of a brother officer tending to show that he and Gray had received from headquarters a description of the men wanted for the robberies that was somewhat similar to the description of King and Welch. The evidence does not show that King and Welch were informed by officer Gray why he placed them under arrest. It is to the effect that he simply told them he wanted them. There is no proof that King and Welch knew that the police officer had been informed of the hold-ups. That could only be an inference from the fact that they had been engaged in the hold-ups and might suspect that the police knew about it. In criminal cases the conduct of the prisoner on other occasions is sometimes relevant where the conduct has no other connection with the charge under inquiry than that it tends to throw light upon his motive in doing the act

complained of. (Jones on Evidence,—2d ed.—sec. 143; 3 Thompson on Trials,—2d ed.—secs. 5072, 5076; Abbott's Trial Brief,—2d ed.—Crim. Cas. 684.) In homicide cases evidence of every material fact or circumstance that will throw light on the killing and every motive that might have influenced the mind of the accused that is relevant may be admitted in evidence. Motive, in homicide, is a question of fact to be determined by the jury. It may be inferred from the crime itself or the actions of the accused. The concealment of prior crimes may be the motive in committing a homicide, and evidence may be admitted which tends to prove that the accused was guilty of the prior crime and knew that he was suspected by the deceased to be so guilty; but while such evidence may be relevant in establishing motive, it is irrelevant and improper to admit evidence of the details of the other crime charged against the accused. (2 Wharton on Crim. Evidence,—10th ed.—sec. 899.) To permit all the facts of the other independent crimes to be proved in order to establish motive would be to permit the accused to be tried for two or more offenses at the same time. *Martin* v. *Commonwealth,* 93 Ky. 189; *Carden* v. *State,* 84 Ala. 417; *Attoway* v. *State,* 41 Tex. Crim. 395. It might well be argued in this case that if the State's evidence is to be relied on at all there was no necessity of introducing testimony especially for the purpose of proving motive, as the crime would be clearly proved by the testimony of the circumstances of the shooting if the State proved that King fired the shot that killed Gray. In *Farris* v. *People, supra,* it was said (p. 532) that even though the evidence of another independent crime was admissible for the purpose of showing motive, "it may well be doubted whether testimony so strongly calculated to prejudice the jury against the defendant should have been admitted even though it tended to prove a motive, such proof not being necessary to the case." The guilt of plaintiff in error as to several robberies was permitted to be shown, apparently to

fix upon him the crime of murder. This character of evidence was likely to be wrongfully considered by the jury and made to constitute a part of the offense for which the defendant was being tried, as it might well be argued, as it is, in effect, in this court, that one so depraved as to commit the numerous hold-ups would not hesitate to commit murder. Questions as to many of the details of these hold-ups were required to be answered by plaintiff in error and Welch, his associate, that could not but very strongly prejudice the jury against plaintiff in error, such as in one case where a woman was held up with her husband, and King and Welch were required to tell that she said the robbers were taking all the money her husband had although he had small children to support, and that King and Welch,—grown-up, able-bodied men,—ought to be ashamed. Undoubtedly the fact that King and Welch were wanted for these hold-ups and that Gray knew that fact and might be arresting them for that purpose was proper to be shown, but in order to prove motive it was certainly not necessary to prove the details of all these hold-ups. This tended to multiply the issues before the jury and would operate greatly to the prejudice of plaintiff in error, making a fair trial on the charges alleged in this indictment almost impossible. This cross-examination of Welch would have been admissible if on direct examination he had testified with reference to these independent crimes, but none of the questions of counsel for plaintiff in error, nor the answers of the witness on direct examination, referred even in the most remote way to any of these independent crimes. Nor was any attempt made in the direct examination to account for King's whereabouts that evening except when he was in Amburn's saloon. No attempt was made by the State to prove that his testimony as to when he was in Amburn's saloon was untrue. Cross-examination should be confined to matters brought out on direct examination. (*Schmidt* v. *Chicago City Railway Co.* 239 Ill. 494; *People* v. *Brown,*

254 id. 260; 3 Ency. of Evidence, 846; *State* v. *Sleeper,*
94 Atl. Rep. 363; 2 Bishop's New Crim. Proc.—2d ed.—
sec. 1122; *People* v. *Tiley,* 84 Cal. 651.) Welch might also
have been asked questions with reference to these independ-
ent crimes if the testimony as to such crimes tended in any
way to impeach his testimony on direct examination. It
was not claimed on the trial below, nor is it claimed here,
that it was intended to so impeach his testimony.

What has been said concerning the cross-examination of
Welch as to these independent crimes can also be stated
with reference to the cross-examination of plaintiff in er-
ror himself. On his direct examination he did not refer in
the slightest manner to anything relating to these independ-
ent crimes. It is true that he claimed that he wore a cap,
and not a hat, on the night in question, and two or three
persons held up by Welch and King on the night in question,
before Gray was killed, testified that King wore a hat at the
time he held them up. But in cross-examining Welch and
King with reference to these hold-ups it was not claimed,
nor does the cross-examination itself show, that the ques-
tions asked were for the purpose of impeaching them by
showing that King wore a hat earlier in the evening. In-
deed, that seems to have been an afterthought at the time
of the trial, when witnesses were put on in rebuttal by the
State to show that King wore a hat earlier in the evening.
Moreover, it is not at all clear from this record that some
of these witnesses who testified to his wearing a hat earlier
in the evening had been held up by King and Welch. In-
deed, some of the victims of the hold-ups were unable to
testify whether either Welch or King wore a hat or a cap
during the occurrence. By no possible line of reasoning
could the evidence of these last witnesses as to the hold-ups
be admissible, and therefore the cross-examination of Welch
or plaintiff in error as to these particular hold-ups was ab-
solutely without justification for the purpose of identifying
King. If such evidence was admissible at all it was only on

the ground of proving that plaintiff in error wore a hat on
the evening in question, (or to show motive, as heretofore
considered,) and then it should not have been permitted by
the cross-examination of Welch or plaintiff in error in the
first instance. They should have simply been asked if plain-
tiff in error did not wear a hat at a certain time and place
earlier in the evening. If they denied it or failed to explain
the change, the most that would be proper would be to put
on the witnesses who saw King wearing a hat earlier in the
evening to contradict them, and the proof then as to all the
details of the independent crimes ought not to have been
permitted to be made by the State unless it was absolutely
necessary in order to prove that King wore a hat at a given
time and place on the night of the crime.

Counsel for the State argue that even though this evi-
dence was improperly admitted the competent evidence in
the case supports the verdict, and therefore there should be
no reversal. On page 34 of the State's brief it is stated:
"King, armed with a revolver, had forfeited his liberty at
least seven times on that evening. The punishment for
highway robbery committed while armed with a deadly
weapon is from one year to life, which the courts hold is
life unless the criminal is pardoned. Besides that, he has
broken his unexpired parole. His confinement in the peni-
tentiary for horse stealing had done nothing towards re-
forming him. King is a desperate and dangerous criminal.
He has not the slightest regard for the property rights of
anyone. People were robbed indiscriminately on the night
of the murder and shot at if they tried to escape. The
crimes had been planned. Ruthless murder of peaceful citi-
zens was to be a part of the program if any luckless person
refused to be robbed. As a climax to an evening's orgy of
crime unparalleled in the history of Peoria county, an offi-
cer of the law in full uniform was shot down in cold blood
while in the performance of his duty." This is hardly
proper argument to make in this court. It might be effective

if made to a mob in order to incite them to lynch a man,
but can have no place before a jury or court unless our en-
tire theory of criminal jurisprudence is revolutionized. A
man cannot be convicted of a given crime solely because he
is a bad man generally or has committed other crimes for
which he has not been punished. The commission of an in-
dependent offense is not proof of the commission of the
crime with which the man is charged. But such proof can
not be said to be without influence on the mind, for cer-
tainly if one is shown to be guilty of another heinous crime
such showing will permit a more ready belief that the ac-
cused might have committed the one with which he is
charged and will predispose the mind of a juror to be-
lieve the person guilty. Under the long established rules of
Anglo-Saxon jurisprudence in criminal trials, it is not only
unjust to the prisoner to require him to defend himself
against several offenses instead of one, but is also contrary
to the principles of justice to burden a trial with multiplied
issues that will serve to confuse and mislead the jury. It
is not sufficient to say that the evidence justified the verdict,
and therefore, even though the trial court erred in permit-
ting this proof, the case is so clearly made out by other
evidence and the defense so weak that the error must be
harmless. This court said in *Farris* v. *People, supra,* on
page 533: "If the only punishment for the crime of mur-
der in this State was death the point would be entitled to
weight. If it was within the province of the court to as-
sume that the jury would have inflicted the death penalty
because the proof of guilt justified it or if our decision was
to affect this case alone, we might hesitate to order a re-
versal on this theory. The legislature has seen fit to clothe
juries with a wide discretion in fixing the punishment to be
inflicted upon one convicted of murder. Every defendant
on trial for that crime is entitled to the full benefit of the
statute. When all else has failed him he has a right to
stand before a jury unprejudiced by incompetent, irrele-

vant evidence and appeal to them to spare his life. It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence, much less is it our province to say what they should have done, and no opinion is expressed on that subject." In this case, if any juror had a doubt as to the justice of inflicting the death penalty on plaintiff in error, any objection he might have might easily be disposed of by the sort of argument made by counsel for the State in this court, that on general principles and for the good of society, in view of his other crimes, such death penalty ought to be inflicted upon plaintiff in error. Counsel for the State argue that the error in admitting this testimony, if one was made, was merely technical, as that term is ordinarily understood. On the contrary, the question goes to the very merits of a fair trial for a man accused of a given crime.

Counsel for plaintiff in error insists that the court erred in refusing to permit him to prove by King that he (King) had heard William Filaski, now deceased, make threats, some time before the shooting, against officer Gray. This court has said that threats of a third person, other than the accused on trial, against the victim of the crime are mere hearsay and inadmissible; that evidence of this character tends to draw the minds of the jury from the point at issue and to excite their prejudices and mislead them. (*Carlton* v. *People,* 150 Ill. 181; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 52; see, also, *People* v. *Pezutto,* 255 Ill. 583.) On this record we do not think the court erred in refusing to permit proof of the alleged threats of Filaski.

Counsel for plaintiff in error further objects that the court asked improper leading questions of witnesses and commented on the evidence in such a way as to lead the jury to think that he believed certain evidence offered by the State was true. We do not think there is basis for any just criticism of the court for asking improper leading questions. Neither do we think any serious error was commit-

ted by the court in the statements complained of, that he gave as his reasons for admitting certain evidence. Of course, the court should not comment on the evidence, in the hearing of the jury, in such manner as to lead them to understand that he not only thinks such evidence admissible but also thinks that the witnesses were stating the truth. If the court comments on the nature of the evidence in the presence of the jury at the time it is admitted, it should be in such a manner as to cause the jury to clearly understand that it is admitted for what it is worth, and that the jury are the sole judges of its weight and bearing on the issues before them.

Counsel for the plaintiff in error filed an affidavit on the motion for a new trial setting up that he had been desirous of having the court reporter take down the closing arguments in said cause, and that the court reporter stated he could not do so because the judge did not want closing arguments to be reported; that the State's attorney, in his closing argument to the jury, made the following statement: "I am not in the habit of prosecuting innocent men. It has not been a rule of my office. If the defendant were not guilty he would not be on trial in the court. I know him to be guilty. I am in possession of facts that convince me of his guilt." The affidavit further states that counsel objected to these statements of the State's attorney as highly improper and prejudicial to the accused and that the trial court made no ruling on the question. Counsel for the State filed an affidavit by the official reporter admitting that affiant told counsel for plaintiff in error the court would not let him take the closing arguments as it was no part of his duty, but that there were other reporters who could take them down if counsel wished to secure their services. The court reporter was acting, as we understand the record, under the provisions of the statute providing for the appointment by the circuit judges of court reporters in counties outside of the county of Cook to take down evidence in all trials.

(Hurd's Stat. 1916, p. 795.)   This statute,. fairly construed, authorizes the reporter to take down the arguments of counsel as well as the evidence.   The court, on request of counsel, should have required the closing arguments to be taken down by the court reporter.   We do not think, however, that the facts stated with reference to the reporter not taking down in shorthand the closing arguments would be a justification for reversing this case, though we do not agree with counsel for the State that it was the duty of plaintiff in error to have these closing arguments taken down in shorthand if he desired to object to anything that was stated therein by the State's attorney.   Counsel for the State did not deny on the record the truthfulness of the affidavit that the State's attorney made such statements in his closing argument, and the only attempt at justification in the State's brief is that a few scattered sentences were picked out by counsel in making his affidavit and placed together as if they were all stated at the same time.

The State further claims that counsel for plaintiff in error should not have been permitted, under the rulings of this court, to make the affidavit on motion for a new trial. True, we have held it is not ethical for counsel to testify in a case he is trying, but that fact only goes to the weight of his testimony and not to its admissibility.   Even if this rule should apply to counsel making affidavits on motion for a new trial, on the record before us the affidavit of counsel for plaintiff in error on this question has been in no way impeached or contradicted.   We must accept it as stating the facts as they occurred.   Rarely, if ever, is a lawyer justified in stating his personal belief that the cause he is representing is just.   (Sharswood's Legal Ethics, 99; Weeks on Attorneys and Counselors at Law,—2d ed.—sec. 113*b*.) Such action is not considered professional.   By so doing he makes himself a witness without the opportunity of being cross-examined.   Such practice would almost necessarily place the counsel for the accused at a disadvantage

as opposed to a prosecuting officer, who should only desire to have a conviction if he knows the accused is guilty. (2 Thornton on Attorneys at Law, sec. 712, and cited cases.) While such a statement by the State's attorney would not necessarily in every case cause a reversal, (*Spahn* v. *People,* 137 Ill. 538,) it was very apt to inflame the minds of the jury to the prejudice of the defendant. The trial court should have promptly sustained the objection to such remarks and have instructed the jury orally at once, and, if requested, in writing later, to disregard such statements in their consideration of the case. See *Earll* v. *People,* 99 Ill. 123; *Raggio* v. *People,* 135 id. 533.

Objections were also made to the giving of certain instructions for the People upon the ground that they were argumentative and did not state the law clearly. While there may be some basis for these objections on both of these points, we do not consider that reversible error was thereby committed.

Counsel for the plaintiff in error filed affidavits showing that intoxicating liquors were drunk by the jurors during the consideration of the case. Counter-affidavits were filed on behalf of all the jurors and others admitting that a small amount of such liquor was drunk, principally at meals, during the several days occupied by the trial, but stating that no juror was at any time intoxicated or that such drinking of intoxicating liquors in any way affected the outcome of the case. The affidavits on behalf of plaintiff in error do not assert, in terms, that intoxicating liquor was drunk to excess by the jurors or that their verdict was in any way thereby influenced. There can be no question that it is grave misconduct on the part of jurors to use intoxicating liquor to excess during their consideration of a case, and some authorities have held it improper for jurors to use intoxicating liquor in any amount, or for the court to permit it to be used in any amount, during their deliberations on the case, except, perhaps, for medicinal purposes on a

proper showing to the court and under proper restrictions. (2 Thompson on Trials,—2d ed.—secs. 2566, 2567; 12 Cyc. 725.) Under the rulings of this court on the record before us we do not think reversible error was committed in permitting the drinking of the intoxicating liquor in question. *Sanitary District* v. *Cullerton,* 147 Ill. 385; *Davis* v. *People,* 19 id. 74.

. For the reasons stated the judgment of the circuit court will be reversed and the cause remanded to that court for further proceedings according to the due course of law.

*Reversed and remanded.*

FARMER, J., and CRAIG, C. J., dissenting.