## WOLF v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. May 28, 1923.)

No. 285.

1. **Receiving stolen goods ⊗⊸3—Knowledge of theft essential element of offense.**
    It is not per se criminal to receive stolen property, but the crime consists in receiving it, knowing it to have been stolen, and possession of stolen goods, which the possessor is not charged with having stolen, is regarded as innocent, unless they are shown to have been received with knowledge that they were stolen, or under circumstances which would satisfy the jury that he believed them to have been stolen.

2. **Witnesses ⊗⊸344(2)—Evidence of possesion at another time of other stolen goods held inadmissible.**
    On trial of an indictment under Act Feb. 13, 1913, § 1 (Comp. St. § 8603), for having in possession goods stolen while being transported in interstate commerce, knowing the same to have been stolen, permitting defendant to be asked on cross-examination if at a remote time he had not been in possession of stolen bonds *held* prejudicial error.

3. **Criminal law ⊗⊸751—Withdrawal of juror.**
    It is within the power of the court in a criminal as in a civil case to permit the withdrawal of a juror when it is obviously improper to allow the case to proceed any further.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Louis Wolf. Judgment of conviction, and defendant brings error. Reversed.

John B. Johnston and Elijah N. Zoline, both of New York City, for plaintiff in error.

William Hayward, U. S. Atty., of New York City (William J. Millard, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. The plaintiff in error, hereinafter called the defendant, was tried and convicted under an indictment which charged that he unlawfully, willfully, and knowingly had in his possession, with intent to convert to his own use, 150 bolts of woolens, which were stolen while moving in interstate commerce, the goods being taken from a freight house of the New York Central Railroad in New York, knowing the same to have been stolen. The indictment was under the Act of February 13, 1913 (37 Stat. 670 [Comp. St. §§ 8603, 8604]). The part of the statute applicable to the case is found in the margin.[1] The defendant has been sentenced to imprisonment for five years.

1 "Whoever shall unlawfully break the seal of any railroad car containing interstate or foreign shipments of freight or express, or shall enter any such car with intent, in either case, to commit larceny therein; or whoever shall steal or unlawfully take, carry away, or conceal, or by fraud or deception obtain from any railroad car, station house, platform, depot, steamboat, vessel, or wharf, with intent to convert to his own use any goods or chattels moving as, or which are a part of or which constitute, an interstate or foreign shipment of freight or express, or shall buy, or receive, or have in his possession any such goods or chattels, knowing the same to have been stolen. * * * shall in each case be fined not more than five thousand dollars, or imprisoned not more than ten years, or both." 37 Stat. 670 (Comp. St. § 8603)

The goods in question were shipped from a place in Massachusetts to New York City, and although they had arrived in New York they were never delivered to the consignee. While they were still in the possession of the carrier they were stolen. The car in which the goods were transported arrived in New York on July 1, 1920, with its seals on both sides unbroken. Notice of the arrival of the goods was sent to the consignees and received by them on July 2 or 3, and on July 6 they sent their truckman to the freight depot to get the goods and to pay the freight bill. He paid the bill to the cashier and received a duplicate receipt, marked "Paid." The original freight bill and cashier's slip had disappeared from the files of the office and the duplicate was therefore given to the truckman. The original freight bill, marked "Paid," had been stolen, and had been presented to the delivery clerk at the freight station three days before the demand by the truckman of the consignees was made, and upon presentation of the stolen original freight bill, marked "Paid," the goods had been delivered to a man using the name "A. Jones."

The goods consisted of 10 cases of Melton cloth. The market value of the goods at the time of shipment was $1.25 per yard, and their value was $12,500, and the evidence disclosed that on July 9, 1920, which was six days after the consignees had notice of the arrival of the goods in New York, the firm of Moe Smith & Co. in New York City had purchased the 150 bolts of Melton cloth of the defendant for 47½ cents a yard, although the fair market value of the cloth was at the time much in excess of the sum paid. This appears from the fact that three days after Moe Smith & Co. purchased the goods for 47½ cents a yard they sold the whole amount for 67½ cents a yard.

The defendant was arrested on July 25, 1920. He stated at the time of his arrest that he knew nothing about the 10 cases of stolen cloth and that he did not know Moe Smith. The defendant was driving his automobile, which he said was his own car. The detectives found in a locked box in the rear of the front seat of this car a piece of cloth with the distinctive mark on it which the shippers of the stolen cloth put on the cloth which had been shipped to the consignees and which had been stolen. The detectives found in the same box tags which it was claimed were on the bolts of cloth when they were shipped from Massachusetts. After finding these things in the box, one of the detectives showed them to Wolf and said:

"I thought you didn't know anything about these woolens; you declared you didn't sell them to Smith, or you don't know Smith."

The defendant replied that:

"He wouldn't have anything to do with the affair except that he wished we [the detectives] would release Louis Friedman [who was being held by the detectives and was with Wolf when he was arrested] as Friedman had nothing to do with it."

When the detectives asked Wolf for his keys to the box in the car, he told them he did not have any. Thereupon the detectives opened the box with a screwdriver, and on opening it found the tags and the cloth above mentioned. Upon their arrival at the police station with

Wolf they searched his person and found on him a ring with several keys on it, one of which fitted the lock on the box. At police headquarters Moe Smith recognized the defendant as the man from whom he had bought the 150 bolts of Melton cloth, and the defendant then admitted, notwithstanding his previous denials, that he had known Smith for quite some time; and when Smith's books were shown to the defendant, disclosing the sale of the cloth by the defendant to Smith, the defendant said he had nothing to say. The following is an excerpt from the testimony of one of the officers as to what took place at the police station after the arrival there of Wolf:

"I said to Smith, 'Mr. Smith, do you know Mr. Wolf?' He said, 'I certainly do.' I said, 'How long do you know him?' 'Oh, quite some time; don't I, Wolf?' Wolf said, 'Yes.' Wolf says, 'Can I talk to him a minute?' I said, 'Sure; go ahead and talk to him.' I said, 'I will talk to him first, though.' Have you got the books here with this sale and the purchase, the purchase of these goods and the sale of the goods? The goods Wolf sold you—the goods to Edelson & Hand?' He said, 'Yes.' He threw open the books. I said, 'This is the record?' He said, 'Yes; that is the record.' I said, 'Mr. Wolf, is this your bill?' He said, 'I haven't got anything to say.' I said to Moe Smith, 'This is the man that sold you the goods, isn't it?' He said, 'Yes; that's the man that sold me the goods.' I said, 'Did he ever sell you any goods before?' He said, 'He offered other goods before that; I don't think we ever bought any other goods before that; I don't think we ever bought any goods from him before this.' I said, 'Well, Wolf, what do you think of that,' I said, 'You know him all right?' He said, 'Oh, yes; I know him all right; I am going to hit him up for a borrow.' Smith said, 'Then you must know me pretty good, if you can ask me for coin and get it.' So he stepped over alongside of Moe Smith, and there was something exchanged hands between them. I couldn't say whether it was money, or paper, or what it was; but they did have a few minutes conversation, and Wolf walked over to the bench again and sat down. Smith said, 'Well, you are through with me; can I take my books?' I said, 'No, sir; you get the books to-morrow.'"

The defendant was called as a witness in his own behalf. He admitted selling the goods to Moe Smith for 47½ cents per yard, but asserted that he had purchased them from a man by the name of Hoffman, whom he claimed to have known for three or four months. He testified that he never knew that the cloth had been stolen; that he had never denied knowing Smith; that he had never seen the tags which the detectives claimed to have found in his automobile, and he intimated that they had been planted in the automobile by one of the detectives, with whom he had had some dealings and who entertained a grudge against him. Hoffman was not produced as a witness. The defendant testified that after he was arrested he tried to locate him, but was unable to find him. He testified:

"The morning after I was bailed, I tried to locate Hoffman. I was bailed at night. The next morning at 9 o'clock I went to the building at 32 Union Square to look for Hoffman. I found that the office was locked, so I went to the superintendent. That was the man who was on the stand. I asked him, 'Where is Hoffman?' He said, 'We threw him out; he didn't pay his rent, so we got the marshal to dispossess him and throw him out.' I told him at the time that this man Hoffman had got me into trouble on account of some goods I bought from him, and I wanted to locate him, because I was to appear before the commissioner for a hearing the next day. I was not able to locate Hoffman after that."

There was evidence from other witnesses showing that there was such a man as Hoffman, and the superintendent of the building at 32 Union Square corroborated the defendant's testimony that the defendant came there to locate Hoffman some time in July, but that the latter had been put out some two or three weeks before, because he did not pay his rent, and that he never returned to the building and never claimed his goods, and that they were put out on the street and left there. There was also testimony showing that Hoffman had offered to sell to Levi Goldstein 150 pieces of Melton cloth by sample. On the defendant's cross-examination the following occurred:

"Q. Did you ever have stolen goods in your possession before? (Objected to, which objection was overruled, to which ruling of the court the defendant by his counsel then and there duly excepted.) A. No, sir.

"Q. Did you ever have any stolen goods in your possession since you were arrested? (Objected to, which objection was overruled, to which ruling of the court the defendant by his counsel then and there duly excepted.) A. I have never had any stolen goods in my possession since my arrest to my knowledge.

"By Mr. Cotter: Isn't it a fact that on April 24th of this year, right in this city, you were found in possession of $60,000 of stolen registered bonds? A. Not to my knowledge.

"Q. Were you found in possession of any of them? Any part of the $60,000? (Objected to, which objection was overruled, to which ruling of the court the defendant by his counsel then and there duly excepted.)

"Q. Any part of the $60,000? A. I was found with some bonds, but I didn't know that they were stolen.

"Q. Did you have a conversation with Inspector Doran regarding your knowledge of those bonds? (Objected to, which objection was overruled, to which ruling of the court the defendant by his counsel then and there duly excepted.) A. Mr. Doran asked me a million questions.

"Q. Didn't you tell Mr. Doran you knew they were stolen, but didn't know they were stolen from the Post Office Department? A. I did not.

"Motion to withdraw juror, which motion was denied, to which ruling of the court the defendant by his counsel then and there duly excepted.

"Mr. Fallon: I ask your honor to instruct the jury that they must accept his statement as absolutely true, but even that will not remove the atmosphere created by these prejudicial questions.

"Motion denied, to which ruling of the court the defendant by his counsel then and there duly excepted."

Under the common law of England and of the states in this country a person accused of crime is presumed innocent until his guilt is made to appear beyond a reasonable doubt to a jury of 12 men. While the United States has no common law, this presumption of innocence until proven guilty prevails in the courts of the United States, as it does in the state courts. The question as to this presumption of innocence was considered at some length in Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481, in an opinion for the court written by Justice (later Chief Justice) White, in which it was held that an instruction that there cannot be a conviction unless the proof shows guilt beyond a reasonable doubt does not so entirely embody the statement of presumption of innocence as to justify the court in refusing when requested to instruct the jury concerning such presumption. The court had instructed fully on reasonable doubt. In the course of the opinion Mr. Justice White said:

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."

He added:

"The fact that the presumption of innocence is recognized as a presumption of law, and is characterized by the civilians as a presumptio juris, demonstrates that it is evidence in favor of the accused; for in all systems of law legal presumptions are treated as evidence giving rise to resulting proof to the full extent of their legal efficacy."

It is also a general rule of evidence applicable to criminal trials that the government cannot prove against a defendant any crime not alleged in the indictment as aiding the proofs that he is guilty of the crime which the indictment charges. 1 Bishop's New Crim. Proc. § 1120. Alluding to this general rule in People v. Molineaux, 168 N. Y. 264, 291, 61 N. E. 286, 293 (62 L. R. A. 193), Judge Werner said:

"This rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurisprudence from all others, at least from the birth of Magna Charta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until. he has been proven guilty beyond a reasonable doubt."

This general. rule is fundamental and unquestioned that in a criminal case evidence which shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same kind, is inadmissible. Boyd v. United States, 142 U. S. 450, 12 Sup. Ct. 292, 35 L. Ed. 1077; Fish v. United States, 215 Fed. 544, 132 C. C. A. 56, L. R. A. 1915A, 809; People v. Buffom, 214 N. Y. 53, 108 N. E. 184, Ann. Cas. 1916D, 962. As was said in People v. King, 276 Ill. 138, 145, 114 N. E. 601, 604:

"This is but the reiteration of a still more general rule that in all cases, civil or criminal, the evidence must be confined to the point in issue."

In Wharton's Criminal Evidence, vol. 1 (10th Ed.) § 30, the fundamental rule is stated to be that on a criminal trial evidence of collateral facts is generally irrelevant, and it is shown that there are certain exceptions to the rule. Then in section 36 it is said that, in prosecutions for receiving stolen goods, guilty knowledge is the gist or substance of the offense to be established by the prosecution, and evidence of collateral offenses is admissible to establish such knowledge. The writer cites a considerable number of cases which support the rule laid down. But it has been held that' to make such evidence admissible the property received must have been received from the same person. Thus in State v. Ward, 49 Conn. 429, 441, the court said:

"Of course the property must have been received from the same person from whom the goods in question were received in order to show guilty knowledge, but that all the property must be stolen from the same party, or must be similar in character, none of the cases decide. There is no reason for such a doctrine. If the accused knows, when he receives goods, that he receives them from a professional thief, who has made him a receiver of the proceeds of

various thefts before, it adds no force to the evidence that the thefts were all from the same party, or that the stolen goods were similar in character."

In People v. Doty, 175 N. Y. 164, 67 N. E. 303, the cases in the New York Court of Appeals were considered in an elaborate opinion by Judge Werner, and it was laid down that, upon the trial of one indicted for the crime of feloniously receiving stolen property, which the defendant knew to have been stolen, evidence that the defendant had received property stolen by the *same* thieves from a different own-er is admissible to establish guilty knowledge of the defendant in receiving the property charged in the indictment to have been stolen. In the course of his opinion Judge Werner, referring at length to Rex v. Dunn & Smith, 1 Moody, C. C. 146, and Coleman v. People, 55 N. Y. 81, said (175 N. Y. at page 171, 67 N. E. 306):

"What were the qualifications which existed in Dunn's Case and were re-ferred to in Coleman's Case? (1) That all the goods had been stolen from the same owner. (2) That they had all been stolen by the same thief. (3) That the thief had brought them all to the same receiver. *As the second and third qualifications just referred to must exist in every case, it is obvious that the first is the only one that can ever be omitted*, and that is probably what dictated the language above quoted from Coleman's Case to the effect that 'it is unnecessary to say that all these qualifications must exist.'"

In People v. Fryer, 266 Ill. 217, 107 N. E. 134, the defendant was convicted under an indictment which charged him with receiving stol-en property knowing it to have been stolen. He was convicted, but the court reversed the judgment and remanded the case for a new trial. The court said:

"The cross-examination of the plaintiff in error was unfair. He was asked, and required to answer, whether he kept a record of any of the guns he sold, and if he knew the law required him to keep such record, and whether he knew of the city ordinances which required him to make a record of all the property he bought, and he answered to all that he did not. Objections were sustained to the following questions: 'Did you ever buy any stolen property?' 'Did you buy some stolen corn from one Bud Howell last sum-mer?' 'When you lived in Muscatine, were you ever arrested?' 'Were you ever convicted of any misdemeanor or crime while you lived in Muscatine?' 'Were you charged and convicted for assaulting a mate on one of the steam-boats while you were in Muscatine?' These questions were all incompetent, and though objections were sustained to them, and the defendant was not required to answer them, they were prejudicial. The only object in asking them was to induce the jury to believe that the defendant was guilty of other crimes than that for which he was on trial, and unfairly to prejudice him before the jury."

In Regina v. Oddy, 2 Dennison's Crown Cases, 264, the accused was convicted under an indictment which contained three counts. The first count charged him with breaking a warehouse and stealing there-in 50 yards of woolen cloth. The second count charged a simple lar-ceny of the same property. The third count charged him with hav-ing feloniously received the same property, knowing it to have been stolen. He was acquitted on the first two counts, and convicted on the third count. At the trial it was proved that the cloth was stolen on March 3, and that it was found in defendant's possession on March 10. The prosecution was allowed, over objection, to prove that there were found in his possession in his house two other pieces of cloth,

and that on the preceding December 15 he had been in possession of two more pieces of cloth, and that these four pieces had been stolen on the night of December 4 from another mill, and were the property of different owners, no one of whom was connected with the owner of the cloth mentioned in the indictment. The court unanimously held the admission of this evidence was error. Lord Chief Justice Campbell, holding that it was error to admit the testimony under any of the three counts, declared that under the first or second count "it would have been evidence of the prisoner being a bad man, and likely to commit the offenses there charged. But," he added, "the English law does not permit the issues of criminal trials to depend on this species of evidence." He continued:

"So, under the third count, the evidence would only show the prisoner to be a bad man; it would not be direct evidence of the particular fact in issue, viz., that at the time of his receiving these specific articles he knew them to be stolen."

Alderson, B., saying that he was of the same opinion, added:

"The evidence went to show that the prisoner *was in possession* of other property which had been stolen in the previous *December*, and not *that he had received such property* knowing it to be stolen. Now the mere possession of stolen property is evidence, *prima facie*, not of receiving, but of stealing; and to admit such evidence in the present case would be to allow a prosecutor, in order to make out that a prisoner had *received property* with a guilty knowledge, which had been stolen in *March*, to show that the prisoner had in the *December* previous *stolen* some other property from another place and belonging to other persons. In other words, we are asked to say that, in order to show that the prisoner had committed one felony, the prosecutor may prove that he committed a totally different felony sometime before. Such evidence cannot be admissible."

Coleridge, J., Platt, B., and Talfourd, J., concurred.

In Copperman v. People, 56 N. Y. 591, 594, in an opinion written by Chief Judge Church, it was declared that under an indictment charging one with receiving stolen property, knowing it to have been stolen, it was clearly incompetent to show that the accused had other stolen property in his possession. He quoted approvingly from Oddy's Case, already cited, and added that such evidence would not legitimately tend to prove that the accused knew that an article received of one person to-day was stolen by showing that on some other occasion he received another article from another person, not connected with the first, knowing it to have been stolen. Such evidence only tends to create vague and uncertain probabilities.

[1] It is not per se criminal to receive stolen property. The crime consists in receiving it, knowing it to have been stolen. It is not admissible to introduce evidence which merely shows that the accused had in his possession other stolen property. The possession of stolen goods, where the possessor is not charged with their larceny, is regarded as innocent, unless shown to have been received with knowledge that they were stolen, or under circumstances which would satisfy the jury that the possessor believed them to be stolen. Durant v. People, 13 Mich. 351; Kasle v. United States, 233 Fed. 879, 890, 147 C. C. A. 552. As we said in Degnan v. United States (C. C. A.) 271

Fed. 291, mere possession is not enough to establish guilty knowledge. And in 16 C. J. 610, it is correctly laid down that:

"Where the charge is that of receiving stolen goods, evidence of the receipt of other stolen goods by defendant at a time not remote from, and under circumstances connected with, the receipt in question, is admissible to show guilty knowledge, intent, and system. * * * Evidence of other thefts from the same or other persons is not admissible, where there is no proof that they were taken by the *same* thief and brought to the same receiver."

[2] The authorities make it clear that the questions asked the defendant as to the bonds were highly improper and prejudicial. It had not been shown, or otherwise attempted to be shown, that the bonds were stolen bonds, or from whom the defendant had received them. Moreover, the questions propounded by the counsel for the government assumed that the bonds, if received by the defendant, were received *almost two years after* he received the goods which the indictment charged him with receiving with knowledge that they had been stolen. All this testimony was objected to, and the objections were overruled and exceptions taken. Counsel also asked the court to instruct the jury that they must accept the defendant's testimony as true, and that was denied, and an exception taken.

[3] Counsel also moved to withdraw a juror, and that was denied, and an exception was taken. We think the motion to withdraw a juror should have been granted. The "withdrawal of a juror" describes a fiction to which a court may resort when some reason appears which would render the further progress of the case unfair to either party and occasion a total failure of justice. The question of the power of the court to permit the withdrawal of a juror came up in a federal court in 1815 in the Circuit Court of the United States for the District of Massachusetts. In United States v. Coolidge, 2 Gall. 364, 25 Fed. Cas. 622, No. 14,858, Judge Story, sitting as a Circuit Justice, said in that case:

"The question is simply this: A party is on trial before a jury, and a circumstance occurs which will occasion a total failure of justice if the trial proceed; have the court, in such an emergency, power to withdraw a juror? It has been stated from the bar that, in capital cases, the court have not this power; but in a case in Foster's Crown Law, and in several other cases, it has been held that they have. In misdemeanors, there is certainly a larger discretion, and, until the cases just mentioned, capital trials were generally supposed to be excepted. It is now held that the discretion exists in all cases, but is to be exercised only in very extraordinary and striking circumstances. Were it otherwise, the most unreasonable consequences would follow."

The right of the court to permit the withdrawal of a juror in a criminal case, as in a civil one, when it is obviously improper to allow the case to proceed any further, is so well established that it is no longer questioned, and needs no citation of authorities to support it.

The judgment is reversed, and the record remanded, with directions to grant a new trial.