Jim COX, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12130.

Criminal Court of Appeals of Oklahoma.

April 20, 1955.

Rehearing Denied May 18, 1955.

Homer Smith, Gomer Smith, Jr., Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, Presiding Judge.

The defendant, Jim Cox, was charged by an information filed in the Superior Court of Comanche County with the crime of murder, was tried, found guilty of manslaughter in the first degree and pursuant to the verdict of the jury was sentenced to serve a term of 10 years in the penitentiary. Present counsel for accused did not appear at the trial. The attorneys who represented the accused during the trial withdrew after the sentence was pronounced and the appeal was perfected.

It is contended that the evidence was insufficient to sustain the conviction. In order to fully understand this assignment of error and others that are stated, a more complete summary of the evidence than is ordinarily made is here presented.

The defendant shot and killed Floyd Roberts with a .22 caliber repeating rifle on December 28, 1953. The killing occurred near a hay shed on the Ferguson Ranch about five miles from the town of Cache. The evidence would indicate that the defendant shot the deceased because of jealousy arising from the employment of the deceased by Mrs. Johnnie Hadley who owned some pasture land adjoining the Ferguson Ranch. The defendant Cox had at one time been employed by Mrs. Hadley and had even made the public claim that he was her common-law husband but in a lawsuit

which Cox filed asserting such claim about two years prior to this homicide, the trial court found Cox was not the common-law husband of Mrs. Hadley, but had been merely an employee of hers. In that lawsuit the defendant Cox alleged that his common-law wife was living with the said Roberts in adultery.

The deceased, Floyd Roberts, had been employed by Mrs. Hadley to haul several loads of her cattle. On the day of the fatal shooting, Mrs. Hadley had driven to her pasture in a pickup truck in which she had hauled her white "cow horse." Shortly after she had arrived at the pasture Floyd Roberts drove up in his large semi-trailer with a cattle truck body to be used in moving Mrs. Hadley's cattle from the pasture. Mrs. Hadley had made arrangements with Mr. Ferguson to use his cattle chute to load her cattle so Roberts drove his large cattle truck to the loading chute at the Ferguson place and then rode back with Mrs. Hadley in the pickup to her pasture. The cow horse was unloaded from the pickup and Roberts rode out into the pasture and commenced rounding up the cattle. The evidence indicates that at the time of the fatal shooting the defendant was employed by Leo Lewis and Mr. Ferguson in feeding some cattle and hogs for them and it was part of his job each day to go to the Ferguson Ranch and there feed the livestock. On the day in question he had driven to the Ferguson Ranch after Roberts had parked his cattle truck at the chute. Accompanying Cox was Leo Lewis, Jr., a partial invalid. The above evidence is not in conflict. As to what thereafter transpired there is conflict in the evidence of the State and that of the defendant.

Mrs. Hadley testified that while Roberts was in the pasture the defendant came to where she was sitting in her pickup at the pasture gate and commenced to curse and said that he would not let them load the cattle at the Ferguson chute. She testified defendant acted like a madman and as if he were drunk. That defendant said, "Tell that s. o. b. to come and get that truck right now." That Cox then turned the pickup he was driving and left. That she then went into the pasture where Floyd Roberts was

driving the cattle and informed him of what Cox had said. Her cattle had already been rounded up and they were preparing to drive them to the Ferguson chute. That they decided that the best thing to do was for Roberts to go move his truck. That Roberts drove her pickup and she rode the white horse. That after Roberts had gone she wired up the gate and then got on the horse and had ridden to the corner. That as she reached the corner the defendant Cox came by driving the Lewis pickup. That he said, "Go pick the son-of-a-bitch up; I killed him. He won't be hauling anybody else's cattle." That she then loped her horse over the hill and saw the cattle truck still at the same place at the chute. She then saw the pickup parked a short way from the cattle truck near the hay shed, headed east. The motor was still running on the pickup and the south door was open. She ran around the pickup and saw Floyd Roberts lying on his stomach and face. Blood was coming out of his mouth and nose. He appeared to be dead. He had on his gloves and they were filled with blood. He was unarmed. She did not touch the body but could tell that he was dead. She tied up her horse, got in the pickup, drove to the town of Cache to the Simmons Garage and told what had happened. A call was made to the sheriff's office. The shooting occurred about 4:00 P.M. An ambulance driver and some other parties from Cache returned with Mrs. Hadley to the scene of the shooting and arrived there before 5:00 P.M. Shortly thereafter some deputy sheriffs arrived with a photographer. Pictures were taken before the deceased was moved and pictures were also taken of the deceased after he was taken to the funeral home and the clothing removed from his body. These pictures were all admitted in evidence.

Marvin Cameron, Justice of the Peace, testified that he was at the county jail when Jim Cox came in about 5:00 P.M. He had also been there when the deputy sheriffs had been notified a few minutes earlier that Floyd Roberts had been killed. That Cox said that he had shot Roberts. That he asked him if he had killed him and Cox answered, "I don't know." That he then

asked, "How many times did you shoot him?" and Cox said, "I don't know." That Cox then handed him the rifle. That Ray Hall, an F.B.I. man was there and noticed the safety was off and inquired, "How many shells in the gun?" and defendant said, "I don't know." That Hall then unloaded the gun and found only one cartridge. In describing what the defendant related concerning the shooting the witness testified:

"He told me he was out at this farm four miles south and about a quarter east of Cache. And he told me he was down there working and Floyd Roberts came down to load some cattle and he told Floyd not to load those cattle there; he didn't want him to. And he said Floyd started to get out of the pickup truck, and in the past he had threatened he was going to kill him or whip him or hurt him; and he knew when he got out of that truck he was bound to get a whipping or get killed and he levelled down on him. Q. Did he mention in the course of this conversation Floyd Roberts had a gun? A. No, sir."

That the defendant wanted to keep on talking but the witness advised him not to say any more until he had talked to a lawyer. That a lawyer was then called for the defendant and he came immediately to the jail and conversed with defendant.

C. A. Vokins, the funeral director, and Clay Clingan testified that they went to the Ferguson Ranch about 4:30 P.M. and found the deceased lying with his face down with his feet toward the south. They felt of his body and determined that he was dead but did not move him. That the body did not appear to have been moved after he had fallen. He had on gloves. His left arm was bleeding very badly. That while they were there the officers arrived. There were no firearms or weapons around the body.

Arvil Roberson, a deputy sheriff, testified that he went immediately to the Ferguson Ranch after he was notified of the shooting and arrived there while the funeral director was still there. That the deceased was lying face down when he arrived. That he had on gloves and there was blood in the gloves. That he turned the body over and could see there had been considerable bleeding from his nose or mouth. That he could not see any weapon around the body and searched his clothing but could find nothing in his clothing except his pocketbook. That he went to the funeral home and was present when they removed the clothing from the body of the deceased. He testified that he saw bullet holes in the body of the deceased. He described two bullet wounds in the left arm of the deceased and he said that all of the bullets had entered and left the arm leaving four holes in the left arm of the deceased. One of the bullets had struck the wrist of the deceased and had broken it. Another bullet wound was about four and one-fourth inches down on the right arm of the deceased. Counsel for the accused in their brief challenge the statement in the Attorney General's brief that the evidence shows that the deceased was shot in the back and was struck six or more times. For some unexplained reason the photographic exhibits were not attached to the casemade. In order to better understand the nature of the location of the wounds and their number we wrote to the court reporter and have been furnished the various photographs which were admitted in evidence. These photographs plainly show several different bullet wounds, in the arms and in the back. We admit there was some confusion in the testimony of the doctor and the deputy sheriff who examined the wounds in that the doctor instead of describing specifically the location of the wounds would state, "There was one here." However, the doctor did state that an X-ray showed there were three bullets still in the chest of the deceased but he could not tell from the X-ray whether the bullets had come from the front or from the back. State's Exhibit 10 shows three or more bullet wounds in the back while State's Exhibits 11 and 12 which were pictures of the chest and arms of the deceased show the several wounds in the arms but none in the chest. In addition deputy sheriff Roberson in identifying the clothing removed from the deceased pointed to bullet holes in the shirt and stated that those holes showed where the bullets had entered the body. In describing the holes he pointed one out and said, "It is in the back of the garment behind the left shoul-

der.", He then said without identifying where he was pointing, "There's a hole there and there's a hole. There's blood stains around there. There's a hole there. Here's one here." In further questioning he said, "Here it shows a bullet in the center in the back behind the left shoulder; and there's another hole here." Question: "Where would that be?" Answer: "On the left side of the back lower down." If we understand this testimony correctly, in addition to the bullet wounds in the arm, the deputy sheriff testified that he found four wounds in the body which would have made a total of at least seven bullets that struck deceased.

The witness Roberson further testified that he examined the ground at the scene where the body was lying. That about six steps north of the body there were several drops of blood about the size of a silver dollar; that the blood went to a place about eight and one-third steps west of the body and then back to the body. That the deceased had fallen across a 2 x 10 or 2 x 12 board and there was a large quantity of blood on this board. That he looked around on the ground but was unable to find any shells, but later that evening he examined the pickup of the defendant and found one empty shell in it. Pictures were taken of the pickup belonging to Mrs. Hadley and also of the one which had been driven on that day by the defendant. On the lower right-hand corner of the left side of the windshield of the Cox pickup was a bulge from the inside which had not penetrated the windshield. Some of the glass around it had flaked off.

Gordon Ferguson testified that he was the owner of the ranch where the shooting occurred; that he had a corral at the ranch and a loading chute. His property was about one-half mile west of the Hadley property. That he had given Mrs. Hadley permission a few days before the shooting occurred to load her cattle at his cattle chute.

Everett Hale, the sheriff, testified to the investigation that he made on the afternoon of December 28, 1953. That he examined the pickup that Cox had been driving and found a jacket in the seat. In the pockets of the jacket he found an empty .22 shell and several loaded shells. That when he arrived back at the sheriff's office, the defendant and his attorney were in the north room of his office engaged in conversation. The next morning he again examined the Cox pickup and found an empty .22 hull on the floorboard. He then described the rifle which the accused used and stated that it was a Mossberg bolt action rifle which had a large magazine which would hold fifteen long rifle shells. That the gun could be shot fifteen times without reloading by operating the bolt.

Oral Ridgeway, an investigator out of the county attorney's office, testified that he and deputy sheriff Marvin Terry examined the Hadley pickup truck and found a bullet hole in the right-hand door. This bullet hole was in the inside of the door panel and the witness testified that it struck the metal track in which the window glass was set causing a dent in the track and that when the bullet struck the metal track it lost its force and dropped to the bottom of the door. It was there found flattened. It was a .22 bullet. From the angle at which the bullet hole was made it was shot from toward the front of the pickup and came through the open left window of the pickup. It could not have been made with the right-hand door closed and could only have been made with the right-hand door open about four to six inches. The bullet hole was probed to determine the direction from which the shot had come. The witness then testified:

"Q. How many different positions did you put this right hand door in to determine which direction the bullet might have come from? A. We placed it in several different positions to see if a bullet could come from behind the truck and get in.

"Q. Was that possible? A. No, sir.

"Q. The only place a bullet could have entered from that angle was from where? A. From the door glass opening on the left hand side."

On behalf of the defendant Leo Lewis, Jr. testified that Jim Cox was employed by

his father to feed cattle. That the witness had been feeding cattle on the day that Floyd Roberts was killed and repairing troughs with the defendant at various pastures being used by his father. That about 3:00 P.M. he and defendant drove to the Ferguson place to feed some cattle and there found a Dodge truck backed up to the loading chute. That they then drove about a mile and a half west to where Mrs. Hadley was sitting in a pickup at a gate. That defendant told her that they weren't going to unload any cattle at the Ferguson chute; that Mrs. Hadley said something but he did not understand what it was. That he saw someone out in the pasture about one-half mile away riding a white horse gathering cattle. That Cox told him that the truck at the loading chute belonged to Floyd Roberts but did not say anything else to him about it. That he and Cox then drove back to the Ferguson place and stopped their truck north of the hay shed in sort of a circle driveway facing west. That Cox did not say anything to him while they were parked. That shortly after they arrived Floyd Roberts drove up in a pickup truck and parked south of their pickup between the Lewis pickup and the hay shed. The witness testified:

"Q. Did you hear any conversation between Jim Cox and Floyd Roberts at that time? A. Floyd drove up and said, 'Hello, Jim, how are you?' And Jim said, 'Just fine.' And Jim said, 'You aren't going to load any cattle here,' and Floyd says, 'We'll settle that right now. Gordon said we could.'

"Q. What happened? A. Then Floyd said, 'We'll settle that right now.' And he reached down to open the door and reached down under the seat with his other arm and started coming out of the seat.

"Q. What did you do at that time? A. I jumped under the dashboard.

"Q. What happened then? A. The shooting started."

The witness testified that he heard the firing of shots and glass fell on the top of his head. The witness further testified that he did not see a rifle in the pickup and did not see Cox fire a rifle, and that the first time he saw the rifle was after they had left the ranch and he had raised up from the floor of the pickup and then saw the rifle. He testified that the dented place in the windshield was caused from a shot fired from outside of the truck while he and Cox were sitting in the truck and had to come from Roberts. He said several shots were fired but he did not know how many. On cross-examination he testified:

"Q. Could you tell whether any shots were being fired from the pickup being occupied by Floyd Roberts? A. No, sir."

He further testified that after the shooting occurred Cox brought him back to town but that on the road back not one word was said. That he did not raise up from under the dashboard until after they had left the ranch and did not know that Roberts had been shot until he heard about it later after he had gone home. He denied that Jim Cox yelled at Mrs. Hadley after the shooting as they were turning the corner on their way to town.

Jim Cox, the defendant, testified that he was 42 years of age and had lived in the community where the homicide occurred since 1927; that he had known Mrs. Hadley about 20 years. That he resided in her home from 1945 to October, 1951. That he had some difficulty with Mrs. Hadley which ended in a lawsuit between them and he moved from her place to his mother's. That he had some difficulty with the deceased in 1952; that the deceased came to the defendant's home and threatened him over the title to a trailer which the defendant had sold to the deceased. The defendant claimed the deceased owed $700 on the trailer and the deceased claimed that he had paid for the trailer. Later he said he saw the deceased circling his house and on another occasion deceased was in a car with Morris Hadley, the son of Mrs. Hadley, when Hadley ran into the back of a truck which Cox was driving. He further testified that in the fall of 1953 Mrs. Hadley came to him and said, "Floyd is going to kill you over that trailer." He said a farmer named Fred Mahaffey told him that Floyd was going to hide his pickup down

there where defendant was feeding and when he came to feed was going to kill him. (Mrs. Hadley and Mahaffey each testified in rebuttal that no such statements were ever made to the defendant.) Defendant further testified that he had repeatedly reported to the sheriff's office about the conduct of the deceased. He testified that on the day of the homicide he was working for Leo Lewis and Mr. Ferguson and was feeding over 500 cattle. That he went over to the Ferguson Ranch in the pickup with Leo Lewis, Jr. That he saw the truck of the deceased sitting at the loading chute and he drove up to where Mrs. Hadley was sitting in the pickup at the gate to her pasture and said, "You aren't going to load those cattle at that chute." In response to the question of his counsel as to why he did not want them loaded at that chute, he said, "Because I had to be working and I didn't want them to be over there while I was there; I was afraid of them." He then stated that he drove back to the hay shed and had been parked about three minutes when Floyd Roberts drove up. The defendant then testified:

"Q. What did he say to you when he came up? A. I believe he said 'Hi' and I said 'Hello, Floyd.' And he said, 'You say we can't load these cattle down here?' I said, 'That's right, you can't load the cattle down here.' He said, 'Gordon told us we could load them here.' And I said, 'Gordon never told me anything like that.'"

Defendant then testified that the deceased reached down toward the floorboard of the truck and pulled a little gun and shot at him. That the bullet hit the windshield of the pickup. That the defendant then opened the door of the pickup, pulled out his rifle and started shooting at the deceased because he thought his life was in danger. That the deceased came around on the north side of the pickup Cox had been driving and then back around to the back of the pickup. That both of them were shooting. That he did not know whether he hit the deceased but he saw the deceased fall in front of the Hadley pickup. That he then got in the Lewis pickup, drove it to Cache and there changed to his own automobile and drove to the sheriff's office and surrendered.

Some of the officers testified on behalf of the accused and corroborated the testimony of the accused concerning the trouble he had had with the deceased over the title to the trailer. The former sheriff testified that he searched the deceased several months before the homicide occurred and found an automatic .22 pistol in a jacket lying in the seat at the side of the deceased in a pickup which he was driving.

Several witnesses testified for the State in rebuttal, one of whom was Betty Cooper, the daughter of Mrs. Hadley, who lived near Hobbs, New Mexico. She testified that the defendant had been to her home on several occasions. She testified that in December, 1951, the defendant came to her home and told her that Floyd Roberts had moved in with her mother and was taking over the place and that if she didn't come and take her mother out of the country away from Floyd Roberts, he, the defendant, "was going to take a gun and kill the son-of-a-bitch."

The above somewhat lengthy summation of evidence shows that there was sufficient evidence to submit the case to the jury for their determination of the guilt or innocence of the accused. It was entirely sufficient to sustain the conviction for manslaughter in the first degree and would have sustained a conviction for the more serious offense of murder.

It is contended that Tink Roberts, brother of the deceased, was guilty of misconduct which prevented the defendant from having a fair trial. The record discloses that while the defendant was testifying the following occurred:

"Q. Will you tell the jury how you were operating the gun by demonstrating with the bolt action? Did you put it up to your shoulder? A. I don't believe I ever put it up to my shoulder. (The witness steps down from the stand, picks up the gun, and points it toward the audience and the counsel table where the State's attorneys and Tink Roberts are sitting. Some of the spectators begin laughing.)

"Q. Point it toward the west wall. (Mr. Wilson steps up to the Bench, and addresses the Court): Mr. Roberts, who is sitting in the presence of the jury, remarks that 'It damn sure wasn't funny when we were burying that boy.' He is sitting there and making those remarks in the presence of the jury and the jury heard it. Let him be admonished not to make statements in the presence of this jury.

"By the Court: (Indicating to Mr. Roberts, who steps to the Bench, out of the hearing of the Jury) Don't make any more remarks that can be heard by the jury because it could cause error and have the case reversed.

"By Mr. Roberts: I am sorry.

"By the Court (to the Jury): Any remarks made by anyone except the witness on the stand are not to be taken by you as any evidence, or for any reason whatsoever."

█ It is evident that the remark of Tink Roberts was addressed to the spectators who were laughing. Counsel for the accused asked the court to admonish the brother not to make such statements in the presence of the jury and the court complied with the request and did so admonish the brother of deceased, and the court went further and advised the jury that the only evidence they could consider was the testimony from the witness stand. No motion for mistrial was interposed and no exception was taken to the court's action and evidently counsel who appeared at the trial were satisfied that nothing prejudicial to their client had been said.

It is contended that during the course of the trial certain of the jurors were guilty of misconduct in that two of the jurors were separated from the other ten jurors and were allowed to stay in a room by themselves without supervision of a bailiff and that on the two nights during the trial and before the case was finally submitted to the jury for their consideration, these two jurors drank intoxicating liquor.

As has been hereinabove noted, present counsel did not appear during the trial. At the hearing on the amended motion for a new trial when this question was first presented, it was shown that one of the counsel for the accused on the first night of the trial entered the room in which the two jurors were staying and there took two or three drinks of whiskey with them. Later in the night about 11:00 P.M. this counsel for the accused returned to the room of the jurors with his wife and the four of them again took a drink or two of whiskey. The two jurors in question each admitted drinking some whiskey on both Wednesday and Thursday nights but stated they only took a drink or two and did not become intoxicated; that they suffered no ill effects from the partaking of the liquor and it did not affect their consideration of the case the following day. No liquor was drunk by them or any of the jurors after the case was finally submitted to them for their deliberation. Regarding this incident Juror Ritzwoller testified that he and Juror Lenz were in Room 211 while the remaining jurors were in two other rooms down the hall. That he and Lenz were playing cards when one of the attorneys for the defendant stopped by the room. His testimony concerning the incident was as follows:

"Rather he was coming down the hall and I looked up. I saw him there at the time and he started to come in the room, and I told him we were jurors in the case that was on trial, and he stood in the door a while and talked to us for a few minutes and passed the time of day. And we didn't talk about anything in particular, more or less generalities, and he had told us that it was his sixth anniversary and a short time later he left the room—no, his wife came to the door to get him, and he introduced us to his wife, and then he left and we continued playing cards and a little later they started down the hall with a couple, whom I don't know, and he stopped in the doorway and these people took him by the arm and they went on—I don't know where they went. Some time later in the evening Mr. Wilson came back and sat down and talked some more and we asked him to leave, and he said, 'I want you to meet my wife,' and we

sat there and talked and finally he said, 'Go get my wife and have her come over.' And he told me the room was around the corner, and I got Mrs. Wilson and she came over, and she sat there and had a couple of drinks and talked about Oklahoma City and people in Oklahoma City and people here they knew. Mrs. Wilson has a relative in the same type of business I am in and we talked about these people, and they later left and that's the sum and substance of the whole thing.

\* \* \* \* \* \*

"I would like to make two observations for the benefit of the judge, that is this: During the time we talked to Mr. Wilson and Mrs. Wilson they did not say anything, make any comment, do anything, nothing at all was out of the ordinary.

"Q. I take it by that there were no remarks made about this case. A. That is right. They conducted themselves like a lady and gentleman and did not discuss this case to us at all.

"Q. Were the intoxicants that you and Mr. Lenz had shared by anyone else besides Mr. and Mrs. Wilson? A. That is all."

On Thursday night the juror testified that he and Juror Lenz had some drinks again but did not become intoxicated and it did not affect them and no one was present in their room or visited with them on that evening. That the only persons who came into their room that night were the bailiffs and some of the other jurors who came up and visited during the card game. On cross-examination the juror testified:

"Q. Didn't I come up the stairway going to my room and I don't know which one, but one of you gentlemen said, 'Purman, come in and have a drink,' and you had a bottle on the table? A. No, sir, I did not, and in the first place I did not know your name was Purman until you came in the room and said, 'Call me Purman.'

"Q. Didn't you call me in and I said, 'I will take a drink with you. I am tired; I have been trying my law-

suit,' and you said, 'I am on the jury?' A. I told you that before you came in the room.

"Q. I said, 'This is highly improper and don't discuss any facts in this case?' A. I will agree with you, you did say after you came in there that it is improper and we didn't discuss any facts."

On redirect examination the juror testified:

"A. No, sir, Mr. Wilson said that: This is the first time he had ever done this and he said he could be disbarred for what he had done, and I didn't see how he could be. He certainly didn't do anything.

"Q. Did you and Mr. Lenz have some conversation about reporting this matter to the judge? A. Yes, we talked it over the next morning and that night. We were a little amazed at what had transpired and the next morning Mr. Lenz suggested possibly we should talk to Judge Landers about this. And, in fact, I told Mr. Lenz 'I don't know what to do. I don't know whether we should or shouldn't. Mr. Wilson didn't do anything that was wrong; he didn't say anything that was wrong; he did say he could be disbarred for this, and I don't see why he should be, because both he and Mrs. Wilson conducted themselves properly.' And we decided then nothing had gone wrong; nothing had been said and there was no reason to report it to the judge. I didn't know what to do."

Juror Lenz testified to substantially the same facts as related by Ritzwoller. He testified that he and Ritzwoller procured a pint of whiskey from the porter after they had eaten the evening meal and that they drank some out of it on Wednesday night and some on Thursday night. That on Wednesday night they shared their liquor with counsel for the defendant and his wife. In this regard he related:

"Our door was open and he stepped inside the room and Mr. Ritzwoller told him we were members of the jury, and he informed us it was his sixth anniversary with his fine wife, and he

came in, and we again informed him we were on the jury and he said that he didn't recognize us. And we sat there and nothing out of the ordinary was said whatever about any trial or about the case or anything like that. Q. What was your subject about? A. The exact conversation I don't remember. He said we had convinced him that we were members of the jury. He said, 'My gosh, I have been practicing for thirty years and nothing like this has happened to me before,' and if he were caught in there he could be disbarred. And he wanted us to meet his wife and he went to get his wife and brought her in and I believe the four of us had one drink together."

The juror testified that a little while later in the evening the attorney came back to his room and they had another drink together. He then testified:

"And then we thought it would be best if Mr. Wilson would go and he said he would if we would meet his wife again. And Mr. Ritzwoller stepped around the hall and got his wife and they had one more drink with us and at that time we talked about some acquaintances Mrs. Wilson knew of Mr. Ritzwoller in Duncan and Oklahoma City. And then Mr. Ritzwoller told them that was fine; he would enjoy their company very much and if they would like to come to his home after the trial, he would be glad to have them; right now was no time to be in their presence. They then left for the evening.

"Q. Did you go to bed soon after that? A. Yes.

"Q. Did you or your room-mate become intoxicated that night? A. No, sir.

"Q. You went to court the next morning regularly with the rest of the jurors? A. Yes, sir.

"Q. Did you feel the effects or the aftermath of your drinking the night before or the next day while you were working as a juror in the trial of the case? A. No, sir."

Both of the jurors testified that they had no conversation with anyone at any time about the trial.

Counsel for the accused testified that he and his wife had room No. 210 at the Midland Hotel which happened to be the hotel where the jury was staying; that he did not know which rooms the jurors were occupying. He said that he was not personally acquainted with any of the jurors and that as he approached his room on the second floor two gentlemen were sitting on the inside of Room 211 with the door opened and as he passed they invited him in; that he did not recognize them but that he was tired because he had been trying the case all day; that as quickly as he was informed by them that they were on the jury that he left and went to his own room. That he had guests visiting him who left about 11:00 P.M.; that Ritzwoller and Lenz came to their room after their guests had left and he and his wife took them back to their room and told them they should stay in the room and should have a bailiff. That he reported the incident to his co-counsel the next morning and discussed the question of whether or not they should move for a mistrial, but they decided no damage had been done so they did not mention it to the court.

The two bailiffs testified concerning the sleeping arrangements. They testified that the jury had a total of four rooms at the hotel. That 13 jurors, which included the alternate, and the two bailiffs occupied the four rooms. That most of the jurors were in two large rooms which were adjoining but the door between them remained open and that one of the bailiffs stayed in the room with those jurors while another bailiff slept across the hall with a juror, but Jurors Ritzwoller and Lenz were placed together in Room 211. Both of the bailiffs testified that they visited in all the rooms during the evening and that they saw no evidence of any drinking and saw no intoxicating liquor and heard nothing of any jurors partaking of intoxicating liquor. That during the daytime while the trial was in progress, the jurors were in their immediate presence and they knew that none of them partook of

any intoxicating liquor during such time. That after the case was finally submitted, the jurors were kept locked up together until they returned their verdict.

Juror Strickland testified that he was a member of the jury that tried defendant and that he stayed across the hall from the room that Ritzwoller was in and that early Wednesday night he went into the room where Ritzwoller and Lenz were playing cards and saw a pint whiskey bottle about one-half full and two Seven-Ups about one-half full sitting on the dresser. That there was another juror sitting in the room with them but he was not playing cards. On cross-examination by the county attorney he testified:

"Q. Was there anything that you observed that indicated to you that there had been any drinking by any of the jurors at all from the time you were sworn in as jurors until you rendered your verdict, except for the whiskey bottle that you have testified about? A. No, I wouldn't say they were under the influence of liquor from appearances. I didn't see them walk; they were sitting down. They were having a lot of fun with their little game. As far as drinking, I don't know whether they did or not. I didn't see them drink.

"Q. From what you observed of them, from your statement you have just made you wouldn't say you were of the opinion they were under the influence of liquor? A. I wouldn't say that. I didn't see them drinking; I didn't see them walk; I didn't smell it. I was within five feet, as far as from me to you and they were playing and they invited me in but I wasn't interested."

The defendant and his girl friend testified that they passed the room occupied by Jurors Ritzwoller and Lenz and the door was open. That it was about 9:00 P.M. and the jurors invited them in for a drink and his girl friend told them, "You wait until the trial is over and we will drink with you." (Jurors Ritzwoller and Lenz positively denied that such occurred.)

Counsel for the accused rely upon the early case of Bilton v. Territory, 1 Okl. Cr. 566, 99 P. 163, 166, wherein this court reversed a conviction on several grounds, one of them being that during the deliberation on the case several of the jurors drank whiskey from a bottle and at a saloon. This court stated that the decisions of the courts of the land were in conflict and about equally divided as to whether the drinking of intoxicating liquor by members of the jury would of itself vitiate their verdict. This court after reviewing the authorities concluded that where the evidence shows that intoxicating liquor "was used as a beverage by the jury during its consideration of a capital case, such conduct of the jury should vitiate the verdict and entitle the accused to a new trial".

In the later case of Allen v. State, 13 Okl.Cr. 395, 164 P. 1002, 1004, L.R.A. 1917F, 210, this court affirmed a conviction for murder and distinguished the case of Bilton v. Territory by laying down two tests for determining whether the partaking of intoxicating liquors was in itself sufficient to vitiate a verdict. First, whether the intoxicant was drunk while the jury was deliberating upon the verdict. Second, whether the intoxicant incapacitated any juror so as to prevent the proper performance of his duties. In the Bilton case the intoxicating liquor was drunk throughout the progress of the trial and while the jury was deliberating upon the verdict. In the Allen case only two members of the jury partook of whiskey mixed with quinine as a medicine during a recess in the trial and the court stated: "It is not shown that the effect of such mixture deadened the sensibilities of the jurors to any extent whatever, or rendered either of them incapable for the proper performance of their duties."

The question here presented is not one easy to decide. It is the duty of courts in the administration of justice and with a regard for the purity of the verdicts of the jury and the rights of the State and the accused to have every verdict freed from any outside influence or consideration so that the verdict returned will be based solely upon the evidence admitted in open court and

the law given to them in the court's instructions.

In this case we think the evidence is conclusive that the whiskey did not intoxicate the two jurors and did not cause any illness, harm or other ill effects. Even counsel for the accused who was in the room with the two jurors and drank with them did not testify that they were intoxicated. We hesitate to make any remark which might be construed as placing the stamp of approval upon the partaking of intoxicating liquor by jurors as we feel such partaking is improper and the bailiff should be careful to see that such is not done, however, we are aware that a great many people in "dry" Oklahoma drink intoxicating liquors at their meals and often take a drink in the evening without any noticeable aftereffects and such conduct does not render them incapable of transacting business on the following day. In People v. King, 276 Ill. 138, 114 N.E. 601, 602, it was held:

> "While it is grave misconduct on the part of jurors to use intoxicating liquor to excess, the fact that jurors consumed small quantities of intoxicating liquors principally at mealtime, did not constitute reversible error; no juror having become intoxicated."

In People v. Romero, 12 Cal.App. 466, 107 P. 709, 710, the court held:

> "That a juror drank liquor during recess of the court is insufficient to vitiate the verdict, where fellow jurors testified that the juror while sitting and deliberating as such was sober, intelligent, and in fit condition to understand and deliberate on the evidence, and determine the verdict."

■■■ We are forced to conclude that no prejudice resulted to the defendant by reason of this alleged misconduct. We base this conclusion in part upon the fact that counsel for the accused visited and drank with the jurors and no other person except other jurors and the bailiff were ever in the room with them. Counsel involved in the drinking testified that he and his co-counsel discussed the matter the next morning and decided that no harm had been done and that they would not call it to the attention of the trial court. In fact the question was not presented in the motion for new trial which was filed on April 5, 1954, but was first raised by amending their motion for new trial at the time the hearing was had on such motion on April 17, 1954. Counsel for the accused according to the testimony of the jurors voluntarily entered their room. Later he returned with his wife and they drank together. Although all parties concede that the case was never discussed, there was fraternizing by counsel for the accused and the two jurors and we know of no words that would in our minds be sufficient to express our disapproval of such conduct. If the verdict had been returned for the defendant, this misconduct would never have become known. Counsel remained silent during the remainder of the trial believing that the things that had transpired would react to the benefit of the accused. And we are convinced that the accused did benefit by the action of his counsel. The testimony of the two jurors showed that they had a very friendly feeling toward Mr. Wilson and his wife and could not see that they did anything out of the ordinary or which would justify criticism of him. Our consideration of the evidence convinces us that the killing was deliberate and premeditated and that the accused was shot many times, some of the shots in the back indicating that he was attempting to escape from his assailant. It is our belief, based upon the evidence, that the fraternizing by counsel for the accused and two of the jurors in which they took a few drinks of whiskey mixed with Seven-Ups, if it had any effect, caused the two jurors to be in favor of the comparatively light punishment which was inflicted. Juror Ritzwoller was foreman of the jury and undoubtedly his friendly attitude toward counsel for the accused is reflected in the verdict. In our view it would be a perversion of justice to allow defendant to be awarded a new trial because of improper conduct of his lawyer which to us appeared clearly to benefit accused. The drinking of the intoxicants under the cited authorities at night when the jury was not deliberating on their verdict was not reversible error and the only

error was the improper communication between defendant's counsel and the two jurors. The prosecution might have been injured but the defendant was not prejudiced by such occurrence.

This assignment of error is based upon the further proposition that the jury was allowed to separate and communicate with unauthorized persons. It is conceded that there was no separation after the final submission of the case to the jury for their deliberation. There was a separation during the trial of the case in the sense that the jurors were kept in separate rooms at night and there were not enough bailiffs to have a bailiff in each room in which there were jurors. The evidence is strong that the door to the room in which Jurors Ritzwoller and Lenz were staying remained open for a large part of Wednesday evening so that they could speak to parties who were passing by their room. A large number of telephone calls were placed from the rooms of the jurors during the trial of the case but not any were made after the case was finally submitted. The two bailiffs attempted to justify the large number of telephone calls on the ground that these calls were made by the jurors in the presence of the bailiffs to their homes or to their business associates in regard to matters wholly disconnected with the trial. However, Jurors Ritzwoller and Lenz did call the hotel porter out of the presence of the bailiffs and purchased the pint of whiskey from him. They stated the porter delivered the whiskey, told them the price, they paid it and nothing else was said. No mention of the trial was made at all.

There was no request from counsel for the accused that the jurors be kept together during the trial. Even in a capital case it is discretionary with the court as to whether the jury should be kept together before final submission of the case. Fry v. State, 91 Okl.Cr. 326, 218 P.2d 643. In Wilcox v. State, 69 Okl.Cr. 1, 99 P.2d 531, 532, it was held:

"Where the proof shows that the jury is permitted to separate after the case has been finally submitted, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden is on the prosecution to show that no injury could have resulted therefrom to the defendant.

"Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced."

See also Gallagher v. State, 81 Okl.Cr. 15, 159 P.2d 562. In the recent case of Hobson v. State, Okl.Cr., 277 P.2d 695, this court had under consideration the action of the trial court in permitting the jury to separate and go home for lunch after the case had been finally submitted to them and to mingle with spectators. In that case counsel was present when the court permitted such to be done and made no objection to the action of the court and this court held that even after the final submission of the case counsel for the accused by standing mute and making no objection when there was ample opportunity to object thereby consented to the separation of the jury and waived the right of the accused to keep the jury together and not permit them to mingle with bystanders after the final submission of the case, citing Martin v. State, 92 Okl.Cr. 182, 222 P.2d 534, wherein it was held that the right of an accused to have the jury kept together in charge of a bailiff after the final submission of the case was a right not inalienable which the defendant could waive.

Lastly, it is contended that the defendant was deprived of his constitutional right to be tried by jury of twelve men as contemplated by the constitution of Oklahoma, Article 2, § 19, Oklahoma Constitution. This assignment of error is based upon the contention of the accused that the two jurors hereinabove referred to were drunk on Wednesday and Thursday nights during the trial of the case and were surely suffering from the results of such intoxication

during the trial on Thursday and Friday and that therefore the defendant was tried and convicted by only ten jurors. Counsel concede that this question was not raised on the motion for new trial but insist that it constituted a denial of a fundamental constitutional guarantee and that this court should consider it on appeal whether or not it had been raised in the lower court.

 Our statements hereinabove made pertaining to the partaking of intoxicants by two of the jurors should effectively dispose of this question because the evidence is conclusive that the jurors were not intoxicated and suffered no ill aftereffects because of the drinking of whiskey. Furthermore, this also was a question that could have been raised in the trial court at the proper time by counsel for the accused who were familiar with the facts but they remained silent and did not raise such question. In John v. State, 79 Okl.Cr. 50, 151 P. 2d 808, this court had a similar question up for consideration and we therein stated that where the jury was not kept together during trial, and it was claimed that a witness for the State talked to a juror during a recess which information of such conversation was conveyed to defendant's attorney, but such attorney did not call such claimed fact to trial court's attention before conclusion of the case, but the question was first raised in the amended motion for new trial, and there was no evidence that defendant was prejudiced, the court did not err in overruling the motion. In the case In re Bibbins, 82 Okl.Cr. 234, 168 P.2d 311, the defendant contended that he was convicted by a jury of ten men but the record disclosed that he waived the right to have twelve men sit as jurors in the case and in disposing of that contention this court stated that under the common law and in Oklahoma prior to statehood, a defendant in a felony case could not waive the right to be tried by a jury of twelve but since adoption of the constitutional provision a defendant in a felony case may waive his right to a jury of twelve and may be tried by a less number of jurors, or may waive the whole panel and be tried by the court. The above decision effectively precludes the defendant from now prevailing upon the con-

tention raised for the first time on appeal that he was tried only by a jury of ten men and that his right to a jury of twelve men was an inalienable right which could not be waived.

Because of the nature of the questions presented on appeal and to enable a better understanding of the issues presented, this opinion is quite lengthy but we are firmly convinced that the accused suffered no prejudicial error in the trial of the case and that the judgment and sentence of the Superior Court of Comanche County should be affirmed. It is so ordered.

BRETT and POWELL, JJ., concur.